UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

THE CITY OF NEW YORK,

                        Plaintiff,        **MEMORANDUM AND ORDER**

              -v-                         06 Civ. 6578 (NRB)

NATARAJAN VENKATARAM, ROSA ABREU,
VISUALSOFT TECHNOLOGIES, LTD., and
D.V.S. RAJU,

                        Defendants.

----------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**



USDS <
DOCUMENT
**ELECTRONICALLY FILED**
DOC #: _____
DATE FILED: _____

        Plaintiff the City of New York (the "City") filed this
lawsuit to recover funds obtained through a fraudulent scheme
perpetrated by defendants Natarajan Venkataram, Rosa Abreu and
others upon the City's Office of the Chief Medical Examiner
("OCME") following Venkataram's and Abreu's indictment by the
U.S. Attorney's Office for the Southern District of New York
(the "Government") in connection with the same scheme.  Each
subsequently pleaded guilty and was sentenced to a term of
imprisonment and was ordered to pay restitution to the City.
The City now moves for summary judgment against Venkataram and
Abreu in this civil action under the Racketeer Influenced and
Corrupt Organization ("RICO") Act, 18 U.S.C. § 1961 et seq.,

seeking \$8,074,193.99 in damages.   For the reasons set forth

below, the City's motion is granted.

## BACKGROUND[1]

OCME manages all functions of the City mortuary, including

the retrieval, processing and autopsy of the bodies of dead

persons, as well as the investigation of deaths suspected to

arise from criminal violence, accident, suicide or that occur in

a suspicious or unusual manner.   (56.1 ¶ 2.)   The agency also

provides forensic services, including DNA testing, in support of

its investigations.   (Id. ¶ 7.)   After the terrorist attacks of

September  11th,  2001,  OCME  faced  the  enormous  task  of

identifying victims' remains through forensic and DNA analysis,

and set about significantly expanding its computer systems to

aid in that task.   (Id. at ¶¶ 7-8.)

---

[1] The following facts are drawn from the City's Statement of Undisputed
Material Facts Pursuant to Local Rule 56.1 ("56.1") and exhibits attached to
the January 30, 2009 Declaration of Ari Biernoff in support of the City's
motion for summary judgment ("Biernoff Decl."). Neither Venkataram nor Abreu
submitted opposing statements of material facts. Accordingly, the City's
Statement of Undisputed Material Facts may be deemed admitted for purposes of
this motion. See S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in
the statement of material facts set forth in the statement required to be
served by the moving party will be deemed to be admitted for purposes of the
motion unless specifically controverted by a correspondingly numbered
paragraph in the statement required to be served by the opposing party.").
Despite defendants' failure to submit responsive 56.1 statements, we have
conducted our own review of the documents the City cites in support of its
56.1 statement, consistent with the Second Circuit's holding that "while a
court is not required to consider what the parties fail to point out in their
Local Rule 56.1 statements, it may in its discretion opt to conduct an
assiduous review of the record even where one of the parties has failed to
file such a statement." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73
(2d Cir. 2001) (internal citations and quotation marks omitted).

2

Venkataram was the director of OCME's Management Information Systems ("MIS") department from 1992 until his arrest in 2005. (56.1 ¶ 10.) He was responsible for the agency's procurement of hardware, software and support services and also oversaw the day-to-day operations of OCME's computer network. (Id.) Abreu worked at OCME from at least 1999 until her arrest in 2005, serving as director of records and Venkataram's principal assistant. (Id. ¶ 4.)

Beginning in 1999, Venkataram conspired with Abreu and others to obtain by fraud funds belonging to OCME. (56.1 ¶ 12.) Venkataram used his position as director of MIS to create a fraudulent contract-and-billing scheme involving numerous business entities, including several shell corporations set up by Venkataram and his co-conspirators. (Id. ¶¶ 15-16.) The primary conduit for the fraudulently obtained funds was an existing computer services company owned by a co-conspirator called Comprehensive Computer Resources ("CCR"), a New York corporation to which Venkataram had awarded numerous contracts between 1999 and 2005. During that period, Venkataram, Abreu and their co-conspirators embezzled millions of dollars from OCME. (Id. ¶¶ 13, 37; Biernoff Decl. Exs. H, K.)

A one-count indictment, filed February 1, 2006, charged Venkataram and Abreu with embezzling OCME funds (in violation of 18 U.S.C. § 666(a)(1)(A) and (2)), including "millions of

3

dollars that had been provided to OCME" by the federal government. (56.1 ¶ 38; Biernoff Decl. Ex. A.) On June 21, 2006, the Government filed a sixteen-count superseding indictment against Venkataram, Abreu and another alleged co-conspirator in connection with the fraudulent scheme they perpetrated on OCME, charging them each with one count of embezzlement (in violation of 18 U.S.C. § 666(a)(1)(A) and (2)) and conspiracy to launder the embezzled funds (in violation 18 U.S.C. § 371); and fourteen counts of money laundering (in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (2)). (56.1 ¶ 39.)

On October 30, 2007, Venkataram pleaded guilty before Judge Patterson to all sixteen counts of the superceding indictment. (56.1 ¶ 41.) In his plea allocution on the conspiracy count, Venkataram admitted that he:

- "obtained by fraud money in excess of $5,000 intended for OCME to [his] own use," and took those funds knowingly and intentionally; and

- conducted financial transactions with the fraudulently obtained funds with an intent to hide the ownership or control of those funds and caused CCR to transfer those funds to third parties on Venkataram's behalf.

(Biernoff Decl. Ex. C at 28-29.)

In pleading guilty to the embezzlement count, Venkataram admitted that he:

- intentionally and knowingly stole, between 1999 and 2005, "at least $5,000 . . . that was the rightful

4

property of the OCME and which was provided to the
OCME by other agencies."

(Biernoff Decl. Ex. C at 32-33.)

Finally, in pleading guilty to fourteen counts of money

laundering, Venkataram admitted that he:

- "engaged in money laundering by conducting financial
  transactions which were designed to conceal [his]
  fraudulent activities in embezzling money from the
  OCME, and so [he] could receive the money without
  being found out";

- caused CCR and other business entities to issue checks
  using the embezzled funds to various business entities
  and shell companies to conceal the embezzlement
  scheme; and

- caused co-conspirators to issue checks from CCR and
  other business entities to conceal his embezzlement of
  city funds.

(Biernoff Decl. Ex. C at 35-44.)   In accepting Venkataram's

plea, Judge Patterson found that Venkataram made "knowing and

voluntary pleas supported by an independent basis in fact,

containing each of the essential elements of the offense."   (Id.

at 51.)

On October 23, 2007, Abreu pleaded guilty before Judge

Patterson to one count of conspiracy, one count of embezzlement

and three counts of money laundering.  (56.1 ¶ 40.)  In pleading

guilty to the conspiracy count, Abreu admitted that she:

- conspired with Venkataram and others to embezzle funds
  from OCME and to launder those funds; and

5

- "was aware that [Venkataram] had or was obtaining some money from contracts with the OCME for the City of New York to which he was not entitled" and that she "used some of the money . . . to pay [her] personal expenses which . . . concealed the true nature of the funds."

(Biernoff Decl. Ex. D at 21, 23.)

In pleading guilty to the embezzlement count, Abreu admitted that she:

- embezzled funds from OCME between 1999 and 2005;

- "assisted [Venkataram] whom [she] knew had or was obtaining money from [a] fraudulent scheme," "was aware that the money came from city contracts," and "used some of the money from one of the companies for personal expenses which [she] knew concealed the true nature of the funds"; and

- was aware that the funds OCME paid to CCR were being diverted to certain companies that she and Venkataram used to launder monies stolen from OCME, and asked OCME to issue checks with the purpose of assisting Venkataram in diverting funds from OCME, through CCR, to the shell companies.

(Biernoff Decl. Ex. D at 21, 26, 35.)

Finally, in pleading guilty to three counts of money laundering, Abreu admitted that she:

- laundered money that she and Venkataram had embezzled from OCME between March 2000 and April 2005 by causing funds to be deposited into bank accounts for various shell companies and business entities, then withdrawing those funds for personal use;

- called OCME's procurement department and "asked them to rush . . . payment to CCR" in the course of their fraudulent scheme;

- "assisted [Venkataram] by obtaining individuals to open bank accounts" for the shell companies, knew that

6

monies embezzled from OCME were deposited in those accounts, and made deposits into the accounts knowing that the purpose of the deposits was to disguise the source of the money; and

• used money that she knew had been embezzled from OCME to pay personal expenses.

(Biernoff Decl. Ex. D at 21-22, 34, 36-37, 38-40.)   In accepting Abreu's plea, Judge Patterson found that Abreu made "a knowing and voluntary plea supported by an independent basis of fact containing each of the elements of [each] offense."   (Id. at 43.)

The Government and counsel for Venkataram each submitted sentencing memoranda and, on March 21 and 28, 2008, Judge Patterson presided over a Fatico hearing[2] in Venkataram's case to determine the amount of money that Venkataram and Abreu embezzled from OCME and laundered through the various shell companies.   (56.1 ¶ 42.)   Judge Patterson held a sentencing hearing on July 11, 2008, during which he heard argument from both the prosecution and counsel for Venkataram, before determining that the City's total loss owing to defendants' fraudulent scheme was \$9 million.   (Id. ¶ 44.)   Following that hearing, Judge Patterson sentenced Venkataram to imprisonment (sixty months on the conspiracy count, 120 months on the embezzlement count, and 180 months on the fourteen money

_____

[2] A Fatico hearing is a testimonial proceeding that the trial court may hold to resolve contested facts that are material to a defendant's sentencing. See United States v. Lin Guang, 511 F.3d 110, 121-22 (2d Cir. 2007) (citing United States v. Fatico, 579 F.2d 707 (2d Cir. 1978)).

laundering counts, with the latter fourteen counts to be served concurrently with the first two counts) and ordered restitution in the amount of $2,970,072. (Id. ¶ 46; Biernoff Decl. Ex. G at 2, 5.)

On October 24, 2008, Judge Patterson sentenced Abreu to imprisonment (sixty months on the conspiracy count, and seventy months each on the embezzlement and money laundering counts, with the latter counts to be served concurrently with the sixty-month sentence on the conspiracy charge), and ordered her to pay restitution to the City in the amount of $1,414,031. (56.1 ¶ 49; Biernoff Decl. Exs. J, K.)

By endorsed memo dated January 21, 2009, Judge Patterson clarified that the defendants are jointly and severally liable for the restitution to the City, with Venkataram responsible for the full restitution amount of $2,970,072, and Abreu's contribution capped at $1,414,031. (56.1 ¶ 51; Biernoff Decl. Ex. L.) On or about January 5, 2009, the U.S. Treasury issued a check to the City in the amount of $836,022.01, which the City received, as partial restitution for the losses the City suffered as a result of Venkataram and Abreu's fraud scheme.[3] (56.1 ¶ 52; Biernoff Decl. Ex. M.)

---

[3] The exact circumstances by which the City received its restitution from the U.S. Treasury are not set forth in the record.

8

This lawsuit was filed on August 31, 2006. The City subsequently reached a settlement with VisualSoft Technologies, Ltd. and D.V.S. Raju, and those defendants were dismissed pursuant to a stipulation on October 3, 2008. Following Venkataram's and Abreu's guilty pleas and the sentencings in the criminal case, the City on January 30, 2009 made the instant motion for summary judgment. In opposition to the City's motion, we received a response filed by Venkataram's counsel on his client's behalf (February 23, 2009 Opposition to Motion for Summary Judgment ("Opp.")), as well as numerous written submissions from Venkataram himself.[4] Abreu, who never answered the complaint in this matter and thus is in default,[5] submitted no opposition to the instant motion.

---

[4] On March 13, 2009, Venkataram's counsel filed a document titled "Supplemental Opposition and Declaration in Support of Opposition to Motion for Summary Judgment" that was signed by Venkataram himself. In addition, Venkataram submitted directly to the Court letters dated April 8, 2009, April 27, 2009, May 12, 2009 and June 19, 2009, as well as an undated document titled "Defendant Venkataram's Supplemental Memorandum of Law in Opposition to the City's Motion for Summary Judgment," received by the Court on May 1, 2009. In his April 27, 2009 and May 12, 2009 letters, Venkataram indicated that he would consider releasing his lawyer and proceeding pro se if we concluded that we could not accept his submissions while he was still represented by counsel. However, we have received no request from Venkataram's counsel for leave to withdraw, and he still appears as Venkataram's attorney of record in this matter on the ECF docket sheet. Nevertheless, although it is "well-settled in this circuit that a party may not proceed in federal courts represented by counsel and simultaneously appear pro se," see, e.g., Rivette v. Smith, No. 06 Civ. 1039, 2008 WL 5000059, at *1 n.1 (N.D.N.Y. Nov. 20, 2008) (citing United States v. Wolfish, 525 F.2d 457, 463 & n.2 (2d Cir. 1975) (defendant "had an experienced counsel and, so long as he retained him, he could not appear pro se")), we have reviewed all of Venkataram's various submissions in the course of reaching our decision here.

[5] At the Court's request, to clarify the procedural posture of the case, the Clerk issued a certificate of default with respect to Abreu on July 1, 2009.

9

**DISCUSSION**

## I. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring a trial. See

10

Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir. 1998) (citing Celotex, 477 U.S. at 322). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. See Lucente v. Int'l Business Machines Corp., 310 F.3d 243, 253 (2d Cir. 2002).

## II. Analysis

### A. Collateral Estoppel Effects of Criminal Convictions

Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Burgos v. Hopkins, 14 F.3d 787, 789 (2d Cir. 1994) (citation omitted). Collateral estoppel bars a party from relitigating facts or issues when "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." NLRB v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir. 1999); see also Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002).

It is well-settled that "a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel . . . in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." United States v. U.S. Currency in the Amount of $119,984, 304 F.3d 165, 172 (2d Cir. 2002) (citing United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978)); see also SEC v. Opulentica, 479 F. Supp. 2d 319, 326 (S.D.N.Y. 2007) ("[defendant] was convicted by guilty plea on securities-fraud charges related to the same activities at issue here. Thus, all questions of fact material to and underlying [defendant's] criminal conviction, as established during the plea allocution, bind [defendant] in this subsequent civil action"). The Second Circuit has explained the reasoning behind this rule as follows:

> The Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case. Because mutuality of estoppel is no longer an absolute requirement under federal law, a party other than the Government may assert collateral estoppel based on a criminal conviction. The criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue.

Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 43 (2d Cir. 1986) (citations omitted).

Accordingly, so long as Venkataram's and Abreu's convictions by guilty plea establish the requisite elements of the City's RICO claim, those defendants are estopped from challenging their liability under that statute. Likewise, Venkataram and Abreu are estopped from contesting Judge Patterson's factual findings regarding the total amount embezzled because they had a full and fair opportunity to litigate that issue during the two-day Fatico hearing.[6]

## B. Civil RICO

To prove civil RICO, a plaintiff must show that a defendant violated the RICO statute (18 U.S.C. § 1962), and that the plaintiff "was injured in his business or property by reason of [the] violation of § 1962." 18 U.S.C. § 1964(c). A plaintiff that successfully makes such a showing is entitled to treble damages plus costs, including attorney's fees. Id. The RICO statute provides, inter alia, that "it shall be unlawful for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

---

[6] Although Abreu did not participate in Venkataram's Fatico hearing, we note that she had the same interest as Venkataram in keeping the loss amount as low as possible, as a higher loss amount exposed her to a greater sentence under the Sentencing Guidelines. See Guidelines §§ 2B1.1, 2C1.1.

13

## 1. Defendants engaged in a "pattern of racketeering activity"

"Pattern of racketeering activity" is defined in the RICO statute as at least two predicate acts of racketeering activity within a ten-year period.  18 U.S.C. § 1961(5).  Money laundering in violation of 18 U.S.C. § 1956 constitutes a predicate offense under RICO.  18 U.S.C. § 1961(1).  To constitute a "pattern," the predicate acts must be related and must reveal continued unlawful conduct, or the threat of continued unlawful conduct.  See Azrielli v. Cohen Law Offices, 21 F.3d 512, 520 (2d Cir. 1994).  Relatedness is established by proof of "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission . . . and are not isolated events."  H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 240 (1989).

In addition, a plaintiff in a RICO action must allege either an "open-ended" pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a "closed-ended" pattern of racketeering activity (i.e., past criminal conduct "extending over a substantial period of time").  GICC Capital Corp. v. Tech. Finance Group, Inc., 67 F.3d 463, 466 (2d Cir. 1995) (citing H.J. Inc., 492 U.S. at 239).

14

Here, Venkataram and Abreu each admitted during their plea allocutions to committing numerous acts of money laundering over the course of several years as part and in furtherance of their scheme to defraud OCME. (See Biernoff Decl. Ex. C at 29-30, 35-44; Id. Ex. D at 21-22, 36-40.) These admitted criminal offenses clearly constituted a close-ended pattern of racketeering activity.

## 2. **Venkataram and Abreu "conducted" and "participated in" a RICO "enterprise"**

A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Venkataram's and Abreu's plea allocutions here reflect that they laundered funds through CCR, which is a corporation under New York law, and thus an "enterprise" for purposes of RICO. 18 U.S.C. § 1961(4).

Venkataram's and Abreu's admissions during their respective pleas also establish that they "conducted" and "participated in" the RICO enterprise. During his plea allocution, Venkataram stated that he had taken OCME's funds by fraud, and that he had conducted financial transactions through CCR with the intention of concealing the ownership and control of those embezzled

15

funds.[7] (Biernoff Decl. Ex. C at 29.) He further admitted that he laundered funds stolen from OCME through numerous other companies. (Id. at 36-44.) Similarly, Abreu admitted that she had used CCR as part of the scheme to launder funds embezzled from OCME (id. Ex. D at 34, 36), issued checks to shell corporations (id. at 35-37, 39-41), and converted the laundered funds for her own use (id. at 21-22).

### 3. Venkataram's and Abreu's activities affected interstate commerce

"The law in this Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce."

---

[7] The following exchange occurred during Venkataram's plea allocution:

> The Court: Now, once you took the funds, I think you said you took them -- I've forgotten the phrase you used, I think it was by fraud, is that right?
>
> The Defendant: Yes, sir.
>
> The Court: Did you conduct a financial transaction with the funds thereafter?
>
> The Defendant: Yes.
>
> The Court: And in conducting the financial transaction thereafter, did you do so with an intent to hide the ownership or control or who was owning or controlling those funds at issue?
>
> The Defendant: Yes, your Honor.
>
> The Court: Did you cause CCR to transfer those funds to third parties --
>
> The Defendant: Yes, your Honor.
>
> The Court -- on your behalf?
>
> The Defendant: Yes.

(Biernoff Decl. Ex. C at 29.)

16

DeFalco v. Bernas, 244 F.3d 286, 309 (2d Cir. 2001). We conclude that defendants' fraud and money laundering scheme here satisfies the interstate commerce requirement for a civil RICO action. OCME is funded by a combination of federal, state and local revenues, and Venkataram's guilty plea included acknowledgement that OCME received federal funds in every year relevant to his criminal conduct. (Biernoff Decl. Ex. C at 28.) In addition, both Venkataram and Abreu acknowledged that the scheme involved issuance of payments to at least one company located in India, as well as deposits of embezzled funds into bank accounts in India, also indicating an effect on interstate commerce. (See id. at 43-44; id. Ex. D at 21-22.)

### 4. **Venkataram and Abreu injured the City's business or property, and this injury occurred "by reason of" the racketeering activity**

Section 1964(c) states: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fee." 18 U.S.C. 1964(c). Defendants' scheme resulted in injury to the City's business and property. In his plea, Venkataram admitted to embezzling money belonging to OCME. (Biernoff Decl. Ex. C at 20-28 (admission regarding conspiracy

17

to embezzle and money launder); 32-34 (admission regarding embezzlement of City funds).) Abreu admitted to substantially similar facts. (Id. Ex. D at 21-22, 26, 34, 36-40.) These admissions also establish that the City's injury was "by reason of" the RICO violation.

## C. Damages

Having concluded that Venkataram's and Abreu's statements during their plea allocutions establish their liability under the civil RICO statute,[8] we now turn to the issue of damages.[9] As noted above, following a two-day Fatico hearing,[10] Judge

---

[8] During Venkataram's plea allocution, he detailed the actions of co-conspirators and described participating in the scheme with the assistance of others. (Biernoff Decl. Ex. C at 29, 41, 42, 44.) Based on these admissions, the City argues, and we agree, that Venkataram and Abreu also violated § 1962(d) of the RICO statute, which provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

[9] Venkataram's opposition prepared by counsel does not contest his liability, but does argue that "Defendant has a viable defense to the damages portion of the instant action" and "seeks a jury trial on the issue of the true damages to plaintiff." (Opp. ¶¶ 3, 4.) In support of this assertion, Venkataram argues that the City has failed to produce certain timesheets that "prove defendant, and his agents actually earned the great majority of amounts billed to [OCME]" and notes that the loss determination by Judge Patterson is currently on appeal. (Id.) We find neither of these arguments persuasive. First, with respect to the timesheets, the City has, pursuant to the Court's order during a conference call on December 17, 2008, made all relevant documents available to defense counsel. (See March 12, 2009 Reply Declaration of Ari Biernoff ("Biernoff Rep. Decl.") ¶¶ 3-4.) Second, with regard to the pending appeal of Judge Patterson's loss determination, it is well-established that the pendency of a criminal appeal generally does not deprive a criminal judgment of its preclusive effect. See, e.g., Chariot Plastics, Inc. v. United States, 28 F. Supp. 2d 874, 881 (S.D.N.Y. 1998) (citing Petrella v. Siegel, 843 F.2d 87, 90 (2d Cir. 1988)); see also United States v. Int'l Brotherhood of Teamsters, 905 F.2d 610, 621 (2d Cir. 1990).

[10] The comprehensive nature of the Fatico hearing here makes this case distinguishable from others where courts have expressed concern about giving

18

Patterson ordered that Venkataram and Abreu are jointly and severally liable for restitution to the City, with Venkataram responsible for the full restitution amount of $2,970,072 and Abreu's contribution capped at $1,414,031.  (56.1 ¶¶ 48-49, 51.) The City received a partial restitution payment in January 2009 for $836,022.01.

Under the civil RICO statute, the City is entitled to treble damages, costs and reasonable attorney fees.  18 U.S.C. § 1964(c).  The Second Circuit has not addressed the question of whether, as a general rule, a set-off occurs before or after the trebling of RICO damages.  Other courts, however, have deducted a set-off after trebling damages.  See City of New York v. Pollock, No. 03 Civ. 0253(PAC), 2006 WL 522462, at *17 (S.D.N.Y. Mar. 3, 2006) (citing Morley v. Cohen, 888 F.2d 1006, 1013 (4th Cir. 1989); Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1310 (7th Cir. 1987)).  We agree that this is the proper course.

Accordingly, we conclude that after trebling, Venkataram and Abreu owe damages to the City of $8,910,216 and $4,242,093, respectively.  Deducting the partial restitution payment, the

---

preclusive effect to prior criminal judgments regarding damages.  See In re Sokol, 113 F.3d 303, 307 (2d Cir. 1997) (collateral estoppel did not apply to prior criminal sentencing because defendant "not only had no incentive to litigate damages" in the criminal action, "he did not actually do so," and the state presented only minimal evidence on damages).  Here, Venkataram's attorney participated vigorously during the Fatico hearing, and Venkataram had every incentive to actively litigate in favor of a smaller loss determination because, as previously noted, a higher loss determination would result in a longer sentence under the Guidelines.  (See, e.g., Biernoff Rep. Decl. Ex. B at 150-52, 168-99; id. Ex. C at 12-13; see also Guidelines §§ 2B1.1, 2C1.1.)

City is entitled to a judgment for $8,074,193.99 -- with the entire amount due from Venkataram and Abreu's share of liability capped at $3,406,070.99.   Venkataram and Abreu are jointly and severally liable for damages up to the cap on Abreu's liability. See Pollock, 2006 WL 522462, at *17.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment is granted, and the City is awarded a judgment in the amount of $8,074,193.99, with the entire amount due from Venkataram and Abreu's share of liability capped at $3,406,070.99.   Venkataram and Abreu are jointly and severally liable for damages up to the cap on Abreu's liability of $3,406,070.99.   The Clerk of Court is respectfully directed to close this case.

**IT IS SO ORDERED.**

Dated:     New York, New York
           July 7, 2009

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on
this date to the following:

Ari Biernoff, Esq.
New York City Law Department, (ALD)
100 Church Street
New York, NY 10007

B. Alan Seidler, Esq.
580 Broadway
New York, NY 10012

Rosa Abreu
c/o Lee Ginsberg, Esq.
Freeman, Nooter & Ginsberg
30 Vesey Street - Suite 100
New York, New York 10007